UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DARRELL BUCKINS,

        Plaintiff,

v.

DEPUTY SANCHEZ, *et. al.*,

        Defendants.

No. C 19-07969 WHA

**ORDER RE MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this Section 1983 action for unconstitutional punishment and retaliation by San Francisco County Sheriff personnel, defendants move for summary judgment. For the below reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

In 2015, plaintiff Darrell Buckins suffered bilateral tibial plateau fractures, and injured his back and neck in an auto accident. For reasons unrelated to this action, law enforcement arrested him on scene. After surgeries to add pins and at least one metal rod in his legs, he was transferred to San Francisco County Jail, where he remained in pretrial detention through mid-2020. He used a wheelchair, walker, and then a cane. By mid-2016, however, doctors did not prescribe him assistive devices to walk (Murphy Decl. Exh. B at 19:1–20:10; 21:11–17; 23:16–21; 42:6–16, Exh. E; Exh. B at 44:5–7; 46:7–10; 46:18–24; 47:2–21).

1.  **ASSAULT ON AUGUST 31, 2018.**

Shortly before August 31, 2018, the jail housed plaintiff at County Jail Four, on Bryant Street in San Francisco. Raw sewage previously flooded plaintiff's cell area numerous times. Plaintiff formally grieved the incidents. On August 31, the jail transferred plaintiff to County Jail Five, the San Bruno location (*id.* at 26:7–19).

While walking to the bus to leave County Jail Four, plaintiff complained about pain in his legs. Handcuffed, he lay prone on what appears in the surveillance footage to be a linoleum floor of the basement at County Jail Four. Deputy Chito Villanueva, a City and County of San Francisco Sheriff's deputy, then dragged plaintiff by his arm, armpit, and perhaps shirt, to an elevator. Villanueva ordered plaintiff to his feet and ordered him to walk into the elevator then ambulate to the transport vehicle, which the record variously calls a "bus" and a "van." Plaintiff testified that it had three to four steps; the one closest to the ground stood "two to three feet" high. Plaintiff "scooted" (presumably, moved using his hands, on his buttocks) up the steps. The bus drove to San Bruno (Murphy Decl. Exh. F, Interrogatory No. 1; Murphy Decl. Exh. D at 00:00–01:41; Exh. B at 113:20–114:10; 115:4–20; 128:12–16).

After arriving at County Jail Five, plaintiff asked to use the railing to disembark. This would require uncuffing him, or at least cuffing his hands in front rather than behind his back. Captain Kevin McConnell, apparently in charge at County Jail Five, told deputies not to allow it. Plaintiff leaned on the railing and descended painfully. McConnell told plaintiff that grievances would not be tolerated and ordered deputies, "Get him." Eight to ten deputies, including Villanueva and Deputy James Sharpe, then "muscled" plaintiff into a holding tank inside the jail. McConnell entered as well. Sharpe ordered plaintiff to his knees, shoved him, and plaintiff complied. This caused extreme pain due to his prior tibial plateau fractures. Sharpe told plaintiff that if complaints continued, an assault would follow, and that Sharpe would claim that plaintiff had attacked him first. Either before or after this threat, but after plaintiff voluntarily got to his knees, Sharpe punched plaintiff in the ribs and shoved his head against the wall. As the record now stands, no medical records document this event. Nor did security footage

capture the events outside County Jail Five or inside the holding tank (*id*. at 148:12-18; 152:14–17; 150:10–12).

### 2. RETALIATION AND ASSAULT ON NOVEMBER 6, 2018.

On November 6, 2018, the jail continued to house plaintiff at County Jail Five. The jail was divided into "pods." In each, two tiers of two-person cells ringed an open common area. When deputies suspected contraband, procedure dictated a "shakedown." Deputies remove all residents from the pod to shake down the cells. Deputies started one around 9:30 PM on November 6. Deputy Ruben Sanchez and his partner ordered the twelve men out of their cells and to sit on the floor facing the walls in the jail's gym and remained to supervise. Thirty minutes to sixty minutes into the search, severe pain in his neck, back, and knees got the best of plaintiff, even though he had frequently shifted positions. He slouched to his elbows (his buttocks and feet still on the floor). He continued facing the wall (Murphy Decl. Exh. E at 10:45; Exh. B at 171:5–10; 173:18–24; 172:14–18).

Sanchez ordered plaintiff to sit up. Plaintiff replied that he had a medical issue and told Sanchez to look at his housing card. Plaintiff believed that this card indicated medical accommodations. Sanchez did not attempt to view plaintiff's card and radioed for back up using the penal code for resisting arrest (*id*. at 173:4–15; 174:4–9; 178:20; 179:1).

Sanchez and his partner hauled plaintiff about ten feet towards the center of the gym, flipped him onto his stomach, and handcuffed him very tightly. They "jacked" the cuffs upwards, causing "unbearable" pain to his wrists. Applying bodyweight, they also flexed his knees painfully. At some point thereafter, an estimated twenty-five other deputies arrived, including Deputies Bernard Kaiwi, Ebenezer Espinoza, and a lieutenant in charge of the unit, Gurav Paul. Sanchez punched and kicked plaintiff in the head and body; Kaiwi did as well and added a "knee strike" to plaintiff's head (*id*. at 188:15–17; Exh. D at 19:48–21:08; Exh. B at 180:3–10; 180:16–181:23; 187:8–17).

Deputies next walked plaintiff from the gym to the interview room in pod 1B, adjacent. Deputies pushed his head down while forcing him to walk backwards at a "normal pace," which,

due to plaintiff's knee injuries, was abnormally fast for him and caused pain (*id*. at 189:2–5; Exh. D at 21:08; Murphy Decl. Exh. B at 180:18–22).

Inside the interview room, defendants forced plaintiff to the floor on his stomach, put a boot on his face and pushed his face into a corner. They added, "Don't look," and took off his pants. Deputies punched and kicked plaintiff's body, bent his knees into unnatural flexion, pressed their body weight onto his legs, and forced his feet into the air. They then left him in that position for thirty minutes. He screamed in pain throughout (*id.* at 192–93:14–10; 195:9–11; 196:1–16).

After the thirty minutes, deputies retrieved plaintiff from the interview room and marched him in the same manner as before (backwards, head pushed down) to pod 2A, the administrative segregation pod. They took him up a flight of stairs into a cell. Plaintiff could not identify any of these deputies with certainty, except for one who is not a defendant. Deputies next forced plaintiff's joints beyond their range of motion and ordered him to lie on the floor beneath a bunk bed for fifteen minutes. They threatened further assault if he moved (*id*. at 207:1–11, 209–10:24–6; Exh. D at 24:40–25:58).

The second amended (operative) complaint alleges violations of his Fourteenth Amendment rights to be free from punishment (excessive force and deliberate indifference), retaliation for First Amendment-protected speech, and related state claims. The second amended complaint names seventeen sheriff's department employees and the City and County of San Francisco. Defendants answered. Defendants now move for summary judgment on all claims. On the eve of the hearing, parties stipulated to dismiss all individual defendants whose personal involvement plaintiff could not identify. This order regarding the remaining defendants follows full briefing and oral argument (telephonic due to COVID-19).

**3. AMERICANS WITH DISABILITIES ACT.**

Plaintiff's claims under the ADA fail. Individual deputies are not "public entities" for Title II purposes. *See Klamut v. Cal. Highway Patrol*, 2015 WL 9024479, at *8 (N.D. Cal. Dec 16, 2015) (Judge Maria-Elena Jones). Plaintiff may name defendant City and County of San Francisco, however. *See United States v. Georgia*, 546 U.S. 151, 154 (2006).

4

To state a disability-discrimination claim under Title II, a plaintiff must demonstrate the County excluded him from "benefits," denied him of the same, or otherwise discriminated against him on account of his disability. *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir.2004). To recover monetary damages under Title II, a plaintiff must show intentional discrimination. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

Plaintiff does not, in his opposition, defend these ADA claims. Nor does he affirmatively waive them. To win on his damages claims, our plaintiff must show defendants' "knowledge" and "deliberate disregard." *Id.* at 1139. Assuming, *arguendo*, that plaintiff had a disability, the record does not show officers knew of it. No indication of *ongoing* disability appeared on his August or November 2018 "housing card," which plaintiff told Sanchez to go read.

That plaintiff had no prescribed accommodations cuts against defendants' intent to discriminate. *See Hubbs v. County of San Bernardino, CA,* 538 F.Supp.2d 1254 (2008) (Judge Consuelo B. Marshall). While defendant testifies that he told deputies he had medical issues, the record does not show that they understood his limitations. He limped, but not violently so, per the surveillance video. Plaintiff's movements do not clearly show that jail staff would have *known* he needed accommodation (*see generally* Murphy Decl. Exhibit D).

As to the ADA claims, the motion is **GRANTED**.

4.   **SECTION 1983.**

Section 1983 analysis proceeds in two steps: *first*, a court determines whether a violation of a constitutional right occurred; *second*, it requires that officials had "fair notice of the illegality of" their "conduct." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174, 1178 (9th Cir. 2020).

A.   *FOURTEENTH AMENDMENT – EXCESSIVE FORCE CLAIM.*

For the reasons that follow, plaintiff's claims for excessive force arising from the three most egregious assaults may proceed. The others fail.

The Constitution protects a pretrial detainee like plaintiff "from . . . excessive force that amounts to punishment" under the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). "[A] pretrial detainee must show only that the

5

force purposely or knowingly used against him was *objectively* unreasonable." *Ibid.* (emphasis added). The decision added,

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.

### *(i) August 31, 2018: Dragging Incident.*

Claim Six alleges an August 2018 excessive use of force by Villanueva. Specifically, Villanueva dragged plaintiff through the hall *en route* to the transport bus and forced him to stand and board the bus. Video surveillance footage and plaintiff's testimony confirm that no gratuitous force appears to have been used. Villanueva's force (however humiliating) served to move plaintiff to the bus for transport, so it had a valid penological purpose. It does not rise to the level of an objectively unreasonable use of force. This claim is **DISMISSED**.

### *(ii) August 31, 2018: Holding Tank Assault.*

Claim Eleven describes an assault that plaintiff suffered immediately after arriving at County Jail Five, on August 31, 2018. This claim survives against Sharpe for his direct participation; Villanueva sufficiently participated, which precludes summary judgment. (Claim Eleven does not name McConnell.)

After arriving at County Jail Five in San Bruno, plaintiff, handcuffed, struggled down the stairs from the bus. McConnell told deputies to refuse plaintiff's request to use the safety rail. Plaintiff leaned heavily on the safety rail and disembarked with difficulty and in pain. McConnell told deputies, "Get him." Plaintiff testified that this meant, "Do something to him, hurt him" (Murphy Decl. Exh. B 143:24; 144:1–3).

Eight to ten deputies "muscled" plaintiff inside County Jail Five and into a holding tank. Sharpe, Villanueva, and McConnell were among those who "forced him" in the room. Plaintiff testified that Sharpe told plaintiff, if plaintiff did not "stop the complaining," Sharpe

"was going to fabricate or falsify an assault charge on a deputy against" plaintiff "to justify beating" him up (*id*. at 147:2; 148:14–18; 150:15–20).

Plaintiff testified:

> Sharpe tried to make me get on my knees on the bench, and I told him that I have a medical condition, and he shoved me into the wall, my head, forced me to get on my knees, where I had to get, even though I think I might have just got on it by myself with some help from them. But other than that, it was get down or get hurt. I know the procedure, so I got down on the bench on my knees, and I was punched. Sharpe pushed my head into the wall. Like I say, Sharpe pushed my head into the wall. I could kind of see around. The captain was present, a few other deputies.
>
> \*   \*   \*
>
> He forced me to my knees, punched me in the ribs and pushed my head against the wall.

Plaintiff testified that this incident left him with bruises, pain, and swelling ("bumps"), but the bruising did not appear on his dark complexion (*id.* at 143:1–12; 150:10–12; 152:14–17; 155:1–25).

Plaintiff had already complied with Sharpe's command. A reasonable jury may glean malicious intent from deputies' obedience to McConnell's order, "Get him," and from Sharpe's verbal threats to beat plaintiff up if he continued to complain, both of which support a violation. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (footnote omitted). Sharpe used objectively unreasonable force, at least on this record.

Separately, Villanueva is liable for failing to intervene. "Although it is true that there are no allegations that" he "took any" physical "action against" plaintiff, jailers may violate individuals' "rights by failing to intervene." *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (quoting *Del Raine v. Williford*, 32 F.3d 1024, 1038 (7th Cir. 1994)). Our court of appeals explained, "A failure of prison officials to act in such circumstances suggests that the officials actually wanted the prisoner to suffer the harm." *Ibid*. The would-be intervener must have a meaningful opportunity to intervene. Opportunity existed, as this incident did not end in a flash.

Sharpe's threats to beat him and falsify assault charges put Villanueva on notice that the blows aimed to punish.

Moreover, it was clear that the violence clearly violated plaintiff's rights. Our facts closely track those of *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). There, a deputy attacked an inmate, "in handcuffs and shackles," punching him in the "mouth, eyes, chest, and stomach while" another deputy "kicked and punched him from behind." "Minor bruises and swelling of his face, mouth, and lip," plus loosened teeth, resulted. *Id.* at 4. The Supreme Court reversed the court of appeals outright. As in *McMillian*, no resistance justified these deputies' use of force, and plaintiff's account of the quantum of physical force appears approximately equal. Jailers should have known it was illegal to "maliciously and sadistically use force," so qualified immunity does not shield defendants. *Id.* at 10 (cleaned up).

The motion for summary judgment on the August 2018 holding-tank assault is **DENIED**.

### *(iii)* *November 6, 2018: Assault in the Gym.*

A jury must decide Claim One, which alleges excessive force for the assault in the gym. Plaintiff's sworn testimony about the excessive use of force on November 6, 2018, stands largely unrebutted. Plaintiff has testified to seeing four named defendants: Sanchez, Kaiwi, Espinoza (all of them deputies at County Jail Five) and Paul, a lieutenant in charge of plaintiff's unit on that day (Murphy Decl. Exh. B 165:4–17).

A cell search for contraband (a "shakedown") precipitated the assault. To conduct the shakedown, deputies ordered everyone out of their cells and into the gym in pod 1A, where they sat on the floor facing the walls. Sanchez and one other guard supervised in the gym. Plaintiff testified that after thirty to sixty minutes of sitting on the floor, he "slouched" to his elbows due to severe pain in his "neck, legs, and back." (To be clear, this pain stemmed from his residual car-accident injuries.) Sanchez ordered, "Sit up." Plaintiff informed Sanchez he "had a medical condition" and told him to look at plaintiff's housing card. Plaintiff erroneously believed this card would show that medical staff had dispensed disability-related accommodations. Sanchez radioed for backup using the penal code section for resisting arrest ("148") (*id.* at 173:13; 174:1– 25; 172:1–18, 22–25; 176:14–25; 57: 22–25).

8

Before others arrived, Sanchez grabbed plaintiff by his collar and, with an unnamed partner, dragged him six to ten feet toward the middle of the gym. Plaintiff recounted that Sanchez started the assault. He testified, Sanchez "flipped me over" and jacked up the handcuffs causing "unbearable" pain in his wrists. They "put their weight on my legs . . . . They kicked me. They punched me. They told me to shut up. They laughed at me" (*id*. at 185–86:18–4; 178–179:22–1).

Sometime after the handcuffing, plaintiff estimated that twenty-five deputies ran into the gym. At least some joined in. Plaintiff identified one he recognized: "Kaiwi came down with a knee strike to my head . . . . [H]e just came right in and just came down with the leg drop." At some point, a deputy said out loud, "He wasn't sorry when he was out there robbing people" (*id.* at 187–88:18–14; 186–187:23–3; 186:15–17).

Plaintiff reported that the incident lasted five to ten minutes, but surveillance video shows that ninety seconds elapsed from the radio call for backup to its arrival. This inaccuracy does not refute allegations of kicks and punches. Plaintiff testified that his "face was all bruised up," and that his arm was x-rayed (and found to be unbroken) (*id.* at 214–16:1–13).

Defendants assert that the undisputed events show reasonable handcuffing and dragging. But plaintiff's testimony disputes it. No resistance or threat from plaintiff justified "the amount of force used," *i.e.* punches, kicks, leg bends, knee-drops. *Kingsley*, 576 U.S. at 397. Nor do threats, efforts to temper the force used, security risk, or resistance point to deputies' reasonableness.

Defendants urge that the lack of medical evidence means no excessive force occurred. Plaintiff need not show documented injury. The "core judicial inquiry" into excessive force, is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)).

Finally, defendants characterize plaintiff as "complain[ing] [that] Deputy Kaiwi's knee hit his head while Plaintiff was being handcuffed." Defendants appear to hope that no one will read

9

plaintiff's deposition transcript, in which he testified to the knee strike. Meanwhile, they offer no affirmative evidence for their theory that Kaiwi hit plaintiff by accident (*ibid.*).

While plaintiff could not identify Espinoza's or Paul's involvement in the gym assault their failure to intervene precludes summary judgment. Plaintiff testified that both arrived after Sanchez flipped plaintiff onto his stomach, which blocked much of his vision. "A failure of prison officials to act in such circumstances suggests that the officials actually wanted the prisoner to suffer the harm." *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (quoting *Del Raine v. Williford,* 32 F.3d 1024, 1038 (7th Cir. 1994)) (cleaned up). Neither intervened in the (at least) 90-second assault, and a jury must decide their liability.

The assault (including the force used to apply the handcuffs but excluding the dragging) served no reasonable penological purpose and the force was objectively unreasonable under clearly-established law. *See McMillian*, 503 U.S. at 10. The motion as to the assault in the gym is, to the extent stated above, **DENIED**.

### *(iv)   November 6, 2018: Interview Room Assault.*

Claim One refers *generally* to excessive force conduct that occurred on November 6, 2018. It accuses defendants Kaiwi, Espinoza, and Paul of "issu[ing] knee strikes to [plaintiff's] body [and] punch[ing] the Plaintiff multiple times in the face and in the body, while Plaintiff was lying on the ground. [And they i]ssued multiple knee strikes to the Plaintiff's stomach and rib section." Defendants also kicked and punched plaintiff in the interview room. Since kicks and punches occurred in both instances, this order considers Claim One to cover both (Amd. Compl. ¶ 47).

Plaintiff testified that defendants Kaiwi, Espinoza, and Paul put him in the interview room:

> They got me to the floor. They moved the chairs out, picked me up again, put me in a corner. And then I thought it was Sgt. [sic] Paul, but it might have been — someone put their boot on my face, but I believe it was Sgt. Paul or Espinoza, one of those. They had put my face in a corner. I believe I might have said it was Sgt. Paul, but I think it was Espinoza, putting my face in the corner.

Plaintiff explained his confusion between Paul and Espinoza. At first, he believed Paul put his boot on plaintiff's face but later heard Espinoza's voice and thought, "That was [Espinoza] that did it" (Murphy Decl. Exh. B 192–193:14–10).

At some point, "Espinoza took [his] pants from [plaintiff], and told [him] to put [his] legs up in the air." Deputy Kaiwi assaulted him further: "He was punching me and kicked me, bent my legs." The punches and kicks landed on his body and head. Plaintiff confirmed that "Kaiwi, Espinoza, Paul" participated in the punches and kicks (*id*. at 195:9–11;196:1; 196:6–7).

Kaiwi, with others, also subjected plaintiff to "leg bends" while either he or others applied bodyweight. This would have put one's knee in extreme flexion, beyond its normal range (*ibid*.).

Espinoza's undisputed conduct (pulling down plaintiff's pants and saying "Don't look") makes him an integral participant. In *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004), the decision found that officers knowledgeable about a plan to use illegal flashbangs on a home who provided back up were liable. Similarly, removing plaintiffs' pants would qualify Espinoza for integral participation, because it rendered plaintiff more vulnerable, humiliated him, and teed him up for the assault that followed. Telling him not to look evinces malice and protected those beating him.

Likewise, plaintiff testified that Paul helped to put him in the interview room and Paul remained there for the assault. This also suffices for integral participation. Since this order finds a genuine dispute about Paul's or Espinoza's role covering for the assailant(s), it does not reach the question of whether Paul or Espinoza would be liable for failure to intervene.

Defendants maintain that the facts are undisputed, but do not concede the facts from plaintiff's testimony. It bears repeating that no fighting or resistance justified the deputies' conduct here. Therefore, the jailers violated the Fourteenth Amendment and, based on the facts alleged, should have known they were violating clearly established law, so qualified immunity does not shield them. The motion is **DENIED**.

### B. FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE.

Passive violations of incarcerated persons' constitutional rights require a showing that a jailer was "deliberately indifferent" — in other words, if an official is subjectively aware of a

11

substantial risk of serious harm to an inmate and disregards that risk by failing to respond reasonably. *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he defendant's conduct need only be objectively unreasonable," not subjectively so. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley*, 576 U.S. 389, 397) (cleaned up).

*(i)     August 31, 2018:  Dragging Incident.*

Claim Seven accuses Villanueva of violating the Fourteenth Amendment but the record does not indicate Villanueva knew about plaintiff's disability or that he acted with deliberate indifference in dragging him to the transport bus and forcing him to board. This claim is **DISMISSED**.

*(ii)    August 31, 2018:  Descending Bus Stairs.*

Claim Nine alleges (against McConnell, Villanueva, and Sharpe) that on August 31, 2018, plaintiff arrived by bus at County Jail Five (San Bruno). McConnell, a sheriff's captain, awaited the bus in San Bruno. On this point, plaintiff testified that he had never before met or spoken to McConnell. Villanueva, to whom he had complained about pain in his legs while walking to the bus at County Jail Four, remained present. Sharpe participated, as well. Before attempting to disembark, plaintiff said,

> A:  I requested to use the rail . . . .
>
> Q:  And why weren't you able to use [the safety rail]?
>
> A:  The captain said not to let me, that I could walk.

(Murphy Decl. Exh. B 133:3–5).

The foregoing suggests that defendants knew that making plaintiff descend the stairs without the railing would hurt him. McConnell's statement, "he doesn't need it" defies the obvious difficulty plaintiff had walking, and his request to use the handrail. Additionally, plaintiff had told Villanueva, who was standing nearby, that he was experiencing severe pain just in walking before boarding the bus. Plaintiff presented no threat. Defendants articulated no

12

reasons for keeping plaintiff cuffed, and — on this record — a reasonable jury could find that this amounted to deliberate indifference.

Clearly-established law did not, however, show that it was plainly unlawful to require plaintiff to walk down the stairs from the bus. Qualified immunity bars this claim. Defendant's motion as to this incident is **GRANTED**.

### (iii) August 31, 2018: Kneeling in the Holding Tank.

Claim Twelve (against Sharpe and Villanueva) addresses plaintiff's forced kneeling in the holding tank on August 31, 2018. As described above, a reasonable jury could find Sharpe's use of force was objectively unreasonable, and Villanueva's failure to intervene unlawful. This order will not sever the forced kneeling from the accompanying assault. Since Sharpe's conduct amounted to excessive force, the Court cannot determine defendants are entitled to summary judgment on plaintiff's Fourteenth Amendment claim for failure to protect from harm. A reasonable jury could conclude that those present disregarded a substantial risk of serious harm. Because this conduct had no penological purpose and other deputies voiced their subjective desires to punish, qualified immunity will not bar this claim. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Defendants have not met their burden, notwithstanding plaintiff's failure to oppose. *See Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003). Summary judgment for this incident is **DENIED**.

### (iv) November 6, 2018: Interview Room Assault and Stress Position.

Claim Four (against Sanchez, De Guzman, Kaiwi, Paul, and Espinoza) alleges deliberate indifference for the interview room "stress position" that plaintiff endured on November 6, 2018. Defendants counter that forcing plaintiff to lie on his stomach during the thirty minute "cooling-off period" cannot amount to punishment, because it served a "legitimate penological purpose" (Br. at 20).

Nothing in our record establishes the need for a cooling period. Furthermore, this order declines to draw an artificial barrier between the holding-tank assault that accompanied the stress hold. Defendants assaulted plaintiff mere seconds before forcing him into the position; this, combined with his screams in pain, sufficiently establishes an obvious risk of harm.

Plaintiff screamed "the whole time," which (viewed in the light most favorable to plaintiff) plausibly means throughout the stress hold as well. Plaintiff adequately alleges a violation of his Fourteenth Amendment right to be free from punishment due to deputies' deliberate indifference (Murphy Decl. Exh. B 196:15).

This violated a clearly-established right. Our court of appeals has held, "[T]he determination of whether a particular condition or restriction imposes punishment in the constitutional sense will generally turn on whether an alternate purpose is reasonably assignable." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008). Evidence of our defendants' intent to punish is strong. Defendants argue, "[T]here is no credible argument a cooling off period amounts to punishment and no evidence the deputies both knew it was substantially likely their conduct would harm Plaintiff's federally protected right." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

In actuality, the very facts that defendants dispute on the issue of liability (most importantly, the degree of deliberate cruelty that defendants displayed) are the "same" disputed "facts" on which the qualified immunity analysis turns. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). Defendants had "fair warning" that their punitive disregard for his serious risk of injury violated a clearly-established right. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006). With respect to this claim, the motion is **DENIED**.

### *(v)   November 6, 2018:  Forced Walking.*

Claim Two alleges deliberate indifference for forcing plaintiff to walk backwards with guards pressing his head down. It also alleges he was forced to walk up and down stairs in this manner. Fact issues related to how much pain plaintiff conveyed to deputies preclude summary judgment on the existence of a Fourteenth Amendment violation, yet plaintiff does not offer any binding precedent that would have established walking him with his head pushed down, backwards as illegal conduct. Nor does this order note any. The motion is **GRANTED**.

### *(vi)   November 6, 2018:  Pod 2A Assault.*

Plaintiff could not identify any named defendants in Claim Five as the ones who, on November 6, 2018, intentionally hyperextended his joints and, by threatening force, made him

lie under a bunk in a cell in Pod 2A. On account of plaintiff's failure to identify a named defendant among his assailants, the motion is **GRANTED**.

### C. FIRST AMENDMENT.

Claim fourteen, plaintiff's First Amendment claim (naming McConnell, Villanueva, and Sharpe) survives *in toto*.

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). "Of fundamental import to prisoners are their First Amendment 'right[s] to file prison grievances.'" *Id.* at 567 (quoting *Bruce v. Ylst,* 351 F.3d 1283, 1288 (9th Cir. 2003)).

Plaintiff testified, "I was moved" "right around the time where I filed the grievance" about sewage flooding at County Jail Four (Murphy Decl. Exh. B at 94:2–3). Once he arrived at County Jail Five, plaintiff recounted,

> And then, when I got my feet on the ground, he just got in my face and said, "We're not having no complaints about the sewage floods here at my jail." He told me to shut the fuck up, don't say nothing. And then he asked me did I understand, and when I said, "You just told me don't say nothing," he said, "Oh, you want to be a smartass." And then he told the deputies surrounding me, that was right there, to get me.

The assault in the holding tank followed immediately thereafter, with McConnell present (*id*. at 135:1–9).

The close timing of plaintiff's protected conduct (grievances) and his transfer provide an inference of retaliation. McConnell's statements and the assault that immediately followed do, as well. The assault had not just a likely chilling effect but an actual one. For example, plaintiff waited until the shift was over to report his injuries, fearing retaliation from a deputy who was

15

present during a later attack on November 6, 2018. As discussed, the assaults lacked any legitimate purpose (*id.* at 214–15:1–25; Br. at 21–22).

Defendants retort that the conduct was not "clearly" unconstitutional. Not so. Our facts track those of *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). Mr. Rhodes filed grievances related to faulty repairs to his typewriter, deputies threatened to transfer him, assaulted him, destroyed his belongings, tried to frame him for theft, and forced him to strip in a sexually abusive way. *Id.* at 565. Some of our facts are worse: plaintiff was transferred, something that defendants admit the *Rhodes* court viewed as retaliatory. McConnell and Sharpe both verbalized the reasons for the assault. Some of our facts differ but appear no less serious: plaintiff was twice beaten, at least once until he screamed, and forced to lie underneath a bunk on threat of harm if he moved. *Ibid.* The *Rhodes* decision denied qualified immunity. It held: "[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." *Id.* (quoting *Pratt v. Rowland*, 65 F.3d 802, 806, n. 4 (9th Cir. 1995)). This fairly informed our defendants of the illegality of beating plaintiff in retaliation for grievances. The motion for summary judgment on this claim is **DENIED**.

### D. STATE LAW CLAIMS.

Plaintiff also alleges state law claims for negligence and battery, and under the Bane Act. As these claims arise out of the same facts as the federal claims, this order retains supplemental jurisdiction. *See Satey v. JP Morgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008). Under the California Tort Claims Act, a plaintiff alleging torts by "public entity or public employee for 'money or damages'" may not proceed "unless a timely written claim has been presented to and denied by the public entity." *Arzola v. Robles*, No. 120CV00816NONESKO, 2021 WL 795667, at *2 (E.D. Cal. Mar. 2, 2021) (Judge Sheila K. Oberto) (quoting Cal. Gov. Code § 945.4).

Our plaintiff seeks money damages. He, through counsel, filed a written complaint with the City and County of San Francisco on May 8, 2019, and defendants do not contest its timeliness. In it, plaintiff reported the November 6, 2018, incident. Defendants argue inadequacy because the complaint stated "1:30 P.M.," not 9:30 P.M. The City and County could easily access incident reports from the jail from that date, thus the complaint appears adequate.

Moreover, the city denied the complaint. His tort claims for damages arising out of the November 2018 incident may be decided on their merits (Murphy Decl. ¶ 8, Ex. G).

### *(i)* *Negligence.*

Plaintiff alleges negligence as to all incidents in this action. Section 945.4 bars a state-law claim for the August 2018 incident. Under California law, the elements of a negligence claim include (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages). *See Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009). To the extent that excessive force and deliberate indifference claims survive above, plaintiff has produced facts to show that McConnell, Villanueva, Sharpe, Sanchez, Espinoza, Kaiwi, and Paul all failed to conform to the duty of care they owed plaintiff. The City and County of San Francisco also faces this claim of negligence. Defendants simply argue that no Fourteenth Amendment violation occurred. The record supports the four elements of negligence, for reasons stated above. Therefore, the motion for summary judgment for negligence is **DENIED**.

### *(ii)* *Battery.*

Plaintiff's battery claim alleges a November 6, 2018, tort. "A battery is any willful and unlawful use of force or violence upon the person of another." Cal. Pen. Code, § 242. "The slightest degree of touching is sufficient." *In re B.L.*, 239 Cal. App. 4th 1491, 1495 (2015) (quoting *People v. Myers* (1998) 61 Cal.App.4th 328, 335)). The battery claim may proceed against Sanchez and Kaiwi for the gym assault. Since Kaiwi, Paul, and Espinoza all, *at a minimum*, "put" plaintiff in the interview room, this claim survives as to that incident against all three. The motion is **DENIED**.

### *(iii)* *Bane Act.*

The Bane Act Claim survives against Sanchez for the November incident in the gym; and against Kaiwi, Espinoza, and Paul for the assault in the interview room, all on November 6.

Excessive force allegations for November will go to a jury.

17

With respect to the November assault in the gym, some assailant said, "He wasn't sorry when he was out there robbing people." At least some laughed and told him to shut up. This would allow a reasonable jury to infer intent (*id*. at 185–86:18–4; 178–79:22–1).

Regarding the November assault in the *interview room*, the statements show malicious intent: "Don't look," "You like to write grievances?!" "What hand do you write with?" and "Break it!" (*id.* 194:1–3; 15–20).

The motion is **DENIED**.

## CONCLUSION

Sharpe, Kaiwi, Espinoza, Villanueva, Sanchez, McConnell, and Paul are the only defendants left in the suit and all must proceed to trial. Each claim survives against the individual defendants to the extent stated above.

The motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

The Court adds that in the above rulings, it has been required by law to credit the opposing side's evidence, here plaintiff's evidence. The Court has not made findings in plaintiff's favor. It will be up to the jury to decide who is telling the truth as to what happened.

**IT IS SO ORDERED.**

Dated: April 9, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE